# 21-3013-cv

## In the United States Court of Appeals for the Second Circuit

———————————

HUGHES COMMUNICATIONS INDIA PRIVATE LIMITED,
PLAINTIFF-APPELLANT

*v.*

THE DIRECTV GROUP, INC.,
DEFENDANT-APPELLEE

———————————

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK (CIV. NO. 20-2604)
(THE HONORABLE ALVIN K. HELLERSTEIN, J.)*

———————————

**PAGE PROOF BRIEF OF APPELLANT
HUGHES COMMUNICATIONS INDIA PRIVATE LIMITED
AND SPECIAL APPENDIX**

———————————

H. CHRISTOPHER BOEHNING
JONATHAN HURWITZ
PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
*1285 Avenue of the Americas
New York, NY 10019*

KANNON K. SHANMUGAM
WILLIAM T. MARKS
PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
*2001 K Street, N.W.
Washington, DC 20006
(202) 223-7300
kshanmugam@paulweiss.com*

# TABLE OF CONTENTS

Page

Introduction ......................................................................................1

Statement of jurisdiction ..................................................................4

Statement of the issues ....................................................................4

Statement of the case ......................................................................5

    A.    The purchase agreement ........................................................6

    B.    Appellant's dispute with the India Department
        of Telecommunications ........................................................8

    C.    Procedural history .............................................................13

Summary of argument .....................................................................18

Standard of review ..........................................................................21

Argument .........................................................................................22

    I.    The license fees constitute 'Taxes' under the purchase
       agreement ............................................................................23

        A.    The plain language of the agreement's definition
            of 'Taxes' encompasses the license fees ................24

        B.    The district court erred by concluding that the
            license fees did not constitute 'Taxes' under the
            agreement ................................................................34

        C.    Indian law is irrelevant to the determination
            of whether the license fees constitute 'Taxes'
            under the purchase agreement ................................38

    II.    Appellant is also entitled to indemnification because
       its pre-closing actions challenging the license fees
       constituted 'Proceedings' under the purchase agreement ...........40

        A.    The plain language of the agreement's definition
            of 'Proceeding' extends to appellant's pre-closing
            actions challenging the license fees ......................42

Page

Table of contents—continued:

    B.    The district court erred in concluding that appellant's pre-closing actions did not constitute 'Proceedings'....................................46

Conclusion........................................................................................54

## TABLE OF AUTHORITIES

### CASES

*Abdullayeva* v. *Attending Homecare Services LLC*,
    928 F.3d 218 (2d Cir. 2019) ................................................23

*Ajdler* v. *Province of Mendoza*, 890 F.3d 95 (2d Cir. 2018) ..............35

*Barker* v. *Deere & Co.*, 60 F.3d 158 (3d Cir. 1995) ..........................26

*Bugliotti* v. *Republic of Argentina*, 952 F.3d 410 (2d Cir. 2020)......40

*Camden County Council on Economic Opportunity* v. *Department of Health & Human Services*, 586 F.3d 992 (D.C. Cir. 2009)..........31

*Capella University* v. *Executive Risk Specialty Insurance Co.*,
    617 F.3d 1040 (8th Cir. 2010).............................................49

*Colon de Mejias* v. *Lamont*, 963 F.3d 196 (2d Cir. 2020)..................21

*Dear* v. *Q Club Hotel, LLC*, 933 F.3d 1286 (11th Cir. 2019) ............33

*Direct Marketing Association* v. *Brohl*, 575 U.S. 1 (2015) ...............30

*Donald B.* v. *Orleans Parish School Board*, 810 F.3d 961 (5th Cir. 2016)......46

*Encino Motorcars, LLC* v. *Navarro*, 138 S. Ct. 1134 (2018) ............42

*Foley* v. *West-Herr Ford, Inc.*, 974 N.Y.S.2d 697 (App. Div. 2013) ................33

*Fundamental Long Term Care Holdings, LLC* v. *Cammeby's Funding LLC*, 985 N.E.2d 893 (N.Y. 2013)..........................49

ii

Page

Cases—continued:

*Global Reinsurance Corp. of America* v. *Century Indemnity Co.*,
  22 F.4th 83 (2d Cir. 2021) ..................................................22

*Goldberg* v. *Kelly*, 397 U.S. 254 (1970) ...............................52

*Goss* v. *Lopez*, 419 U.S. 565 (1975) ................................51, 52

*Grumman Allied Industries, Inc.* v. *Rohr Industries, Inc.*,
  748 F.2d 729 (2d Cir. 1984) ...............................................52

*Haber* v. *St. Paul Guardian Insurance Co.*,
  137 F.3d 691 (2d Cir. 1998) ...............................................52

*Innophos, Inc.* v. *Rhodia, S.A.*:
  832 N.Y.S.2d 197 (App. Div. 2007) ........................25, 26, 30
  882 N.E.2d 389 (N.Y. 2008) ..........................................*passim*

*Kaur* v. *New York State Urban Development Corp.*,
  933 N.E.2d 721 (N.Y. 2010) ...............................................51

*Laing* v. *United States*, 423 U.S. 161 (1976) .......................32

*Lawlor* v. *Cablevision Systems Corp.*, 839 N.Y.S.2d 433 (Sup. Ct. 2007) .......28

*Medical Mutual Insurance Co.* v. *Indian Harbor Insurance Co.*,
  583 F.3d 57 (1st Cir. 2009) ...............................................49

*Ministers & Missionaries Benefit Board* v. *Snow*,
  45 N.E.3d 917 (N.Y. 2015) .................................................22

*MusclePharm Corp.* v. *Liberty Insurance Underwriters, Inc.*,
  712 Fed. Appx. 745 (10th Cir. 2017) .....................................44

*Powers* v. *Stanley Black & Decker, Inc.*,
  137 F. Supp. 3d 358 (S.D.N.Y. 2015) .................................47, 48

*Prestige Limited Partnership-Concord, In re*,
  234 F.3d 1108 (9th Cir. 2000) ............................................32

Page

Cases—continued:

*Quinn Construction, Inc.* v. *RC Dolner LLC,*
 187 Fed. Appx. 129 (3d Cir. 2006) ......................................................31

*Rincon Band of Luiseno Mission Indians* v. *Schwarzenegger,*
 602 F.3d 1019 (9th Cir. 2010) ............................................................33

*Rousey* v. *Jacoway,* 544 U.S. 320 (2005) .............................................26

*Rumsfeld* v. *General Dynamics Corp.,* 365 F.3d 1380 (Fed. Cir. 2004).........44

*Schiavone Construction Co.* v. *Larocca,*
 503 N.Y.S.2d 196 (App. Div. 1986) ...................................................51

*Schmidt* v. *Creedon,* 639 F.3d 587 (3d Cir. 2011) ...............................51

*Tigrett* v. *Rector & Visitors of University of Virginia,*
 290 F.3d 620 (4th Cir. 2002) .............................................................52

*United States* v. *Boulanger,* 444 F.3d 76 (1st Cir. 2006) ....................26

*United States* v. *Parker,* 927 F.3d 374 (5th Cir. 2019) .......................33

*United States* v. *Werner,* 620 F.2d 922 (2d Cir. 1980) ........................26

*Vazquez* v. *TriAd Media Solutions, Inc.,*
 797 Fed. Appx. 723 (3d Cir. 2019) ...................................................44

*Williams* v. *Commissioner,* 718 F.3d 89 (2d Cir. 2013) ......................51

## STATUTES AND RULE

5 U.S.C. § 706 ........................................................................................50

26 U.S.C. § 6203 ...................................................................................30

26 U.S.C. § 6211 ...................................................................................32

28 U.S.C. § 1291 .....................................................................................4

28 U.S.C. § 1332(a)(2) ...........................................................................4

iv

Page

Statutes and rule—continued:

28 U.S.C. § 3203(d)(1) ............................................................... 33

Fed. R. Civ. P. 44.1 ................................................................... 40

N.Y. Banking Law § 19 ........................................................ 31, 33

N.Y. Banking Law § 619(2)(v) .................................................. 31

N.Y. General Obligations Law § 5-1401 ................................ 8, 22

N.Y. General Obligations Law § 5-1401(1) ............................... 22

N.Y. Insurance Law § 7430 ....................................................... 33

N.Y. Tax Law § 184 .................................................................. 28

N.Y. Tax Law § 186-e(1)(e) ....................................................... 29

N.Y. Tax Law § 186-e(2) ........................................................... 29

N.Y. Tax Law § 186-e(1)(g) ....................................................... 29

## MISCELLANEOUS

*Black's Law Dictionary* (11th ed. 2019) ..................................... *passim*

*Oxford English Dictionary* (2d ed. 1991) .................................. *passim*

*Webster's Third New International Dictionary* (2002) ........................... *passim*

## INTRODUCTION

In connection with a corporate spin-off, appellee DIRECTV Group, Inc., agreed to indemnify certain spun-off subsidiaries for "Taxes" incurred before the closing of the transaction, as well as liabilities arising from "Proceedings" commenced before that date. The governing purchase agreement defines both "Taxes" and "Proceedings" in sweeping terms. The agreement's definition of "Taxes" expressly encompasses a long list of enumerated taxes; "assessments," "levies," "deficiencies"; and all "other similar charges of every kind, character or description imposed by any Governmental Authority." The definition of "Proceedings" is similarly broad, covering "any action, suit, litigation, arbitration, proceeding . . . prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation." The rules of construction in the agreement underscore the parties' intent that those definitions be interpreted broadly.

Appellant Hughes Communications India Private Limited is a former subsidiary of appellee that provides telecommunications service in India. There is no dispute that appellant is covered by the purchase agreement's indemnification provision. Before the closing, the government of India issued to appellant a "Provisional License Fee assessment," asserting that appellant had underpaid its license fees and spectrum-usage charges for the use of India's telecommunications spectrum. The government demanded millions of dollars allegedly owed.

Appellant soon notified appellee of the government's assessment and asked if appellee wished to assume control of the dispute pursuant to the terms of the purchase agreement. Appellee declined to do so. A protracted, 14-year legal battle in India ensued; during that period, appellant provided regular updates to appellee. Appellant prevailed on an administrative appeal, but the Supreme Court of India eventually ruled against appellant and other telecommunications service providers challenging similar governmental demands for payment. Appellant sought indemnification from appellee for the judgment imposed by the Supreme Court, but appellee refused.

The pre-closing fees for which appellant is now liable, together with associated interest and penalties, are subject to indemnification under the purchase agreement's broad provisions for indemnification of "Taxes" and liabilities arising from "Proceedings." The agreement by its terms is governed by New York law, and the New York Court of Appeals' decision in *Innophos, Inc.* v. *Rhodia, S.A.*, 882 N.E.2d 389 (2008), interpreted a similar definition of "Taxes" in a way that requires appellee to indemnify appellant here. The charges in dispute are "Taxes" under the purchase agreement because they are franchise and excise taxes. At the very least, they are "similar" to franchise and excise taxes that the State of New York imposes on providers of telecommunication services. The district court itself acknowledged that the charges here have "substantial likenesses" to New York franchise and excise

2

taxes. The charges are also "Taxes" because they are "assessments," "levies," and "deficiencies," all terms encompassed by the contractual definition. Indeed, the Indian government's payment demand was entitled "Provisional License Fee assessment."

The assessments at issue are independently subject to indemnification because they arise from pre-closing "Proceedings" under the purchase agreement's broad definition of that term. Appellant's pre-closing interactions with the India Department of Telecommunications involved an audit of appellant's records; appellant's efforts to reduce the amount of the imposed fees and penalties in the form of written submissions, presentation of evidence, and in-person meetings; and appellant's responses to the Department's invitation to submit additional documentation supporting its position. Those events were the opening stages of a protracted legal battle between appellant and the Department involving additional administrative proceedings and litigation in the Supreme Court of India. Under the broad language of the parties' agreement, appellant is entitled to indemnification for liabilities arising from those proceedings.

The district court nevertheless granted summary judgment for appellee and denied appellant's cross-motion for partial summary judgment. The district court explained its decision in a brief opinion that misapprehends the parties' agreement; ignores the critical significance of its own acknowledgement

that the charges at issue bear "substantial likenesses" to franchise and excise taxes; and fails to give fair effect to the New York Court of Appeals' binding and on-point decision in *Innophos*. The district court's reasoning was erroneous, and its judgment should be vacated and the case remanded with instructions to enter partial summary judgment for appellant on the question of liability.

## STATEMENT OF JURISDICTION

The district court entered final judgment on November 17, 2021. S.A. 9. Appellant filed a timely notice of appeal on December 10, 2021. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291. The district court had subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2).

## STATEMENT OF THE ISSUES

1.      Whether the district court erred by holding that the assessments, interest, and penalties imposed on appellant by the Department of Telecommunications of India and the Supreme Court of India do not constitute "Taxes" subject to indemnification under the purchase agreement.

2.      Whether the district court erred by holding that the same assessments, interest, and penalties do not constitute liabilities arising out of "Proceedings" subject to indemnification under the purchase agreement.

4

## STATEMENT OF THE CASE

Defendant-appellee DIRECTV Group, Inc., agreed to indemnify plaintiff-appellant Hughes Communications India Private Limited for "Taxes" incurred, and liabilities arising from "Proceedings," before the closing date of a purchase agreement. Just over a month before the closing date, the Department of Telecommunications of India issued a "Provisional License Fee assessment" to appellant, including interest and a 150% penalty, demanding payment of 245 million rupees (approximately $5.6 million at the time) for appellant's provision of telecommunication services in India between 2001 and 2003. Appellant challenged the assessment in a series of administrative and judicial proceedings spanning nearly fifteen years. Appellant also sent notice to appellee of the matter, asking if appellee wished to assume control of the dispute pursuant to the terms of the purchase agreement. When appellee declined to assume control, appellant defended against the matter and provided appellee with periodic updates.

In 2019, after years of proceedings before the Department of Telecommunications, in administrative appeals, and then before the Indian courts, the Supreme Court of India issued a final decision in favor of the Department. The court ordered appellant to pay additional license fees, spectrum-usage charges, and 150% penalties, as well as interest on the principal and penalties that had accumulated from 2001 through 2019. Appellant repeated its demand

5

that appellee indemnify it for those assessments, interest, penalties, and interest on penalties. Appellee formally declined that demand in 2020—more than 14 years after appellant first provided notice of the dispute.

In March 2020, appellant brought this action against appellee in the United States District Court for the Southern District of New York (Hellerstein, J.). Appellant alleged that appellee had wrongfully denied appellant's requests for indemnification. After denying appellee's motion to dismiss and permitting limited discovery, the district court granted summary judgment in favor of appellee and denied appellant's cross-motion for partial summary judgment. *See* S.A. 1-8; 2021 WL 5359662 (Nov. 16, 2021).

### A. The Purchase Agreement

Appellant, previously known as Hughes Escorts Communications Limited and Hughes Communications India Limited, is a telecommunications company based in India. D. Ct. Dkt. 75, at 2. Until 2004, it was a subsidiary of appellee. *Id.* at 3. In 2004, appellee entered into a purchase agreement with appellant's parent company, Hughes Network Systems Inc., and a third-party investor to spin off appellant and other subsidiaries to a newly formed entity called Hughes Network Systems LLC (referred to as "Newco" in the agreement). The spin-off was a complex multijurisdictional transaction that involved businesses in twelve distinct jurisdictions, including ten jurisdictions

outside the United States. *See id.* at 4. The spin-off closed on April 22, 2005. *Id.* at 2.

Under the agreement, appellee agreed to indemnify "Newco Indemnified Persons," defined to include "Newco and its Subsidiaries and Representatives from time to time (including persons who were formerly employees, officers and directors of HNS or any of its Affiliates)." D. Ct. Dkt. 61-1, at 83. It is undisputed that appellant is a "Newco Indemnified Person" under the agreement.

Appellee's indemnification obligation extends to all "Taxes" payable for periods prior to the closing date, and to all costs or expenses arising from "Proceedings" initiated before that date. The obligation covers "any and all Damages . . . arising out of, relating to or resulting from . . . Excluded Liabilities." D. Ct. Dkt. 61-1, at 64. In turn, the agreement defines "Excluded Liabilities" to include "Taxes" for "any Tax Period that ends on or prior to the Closing Date," as well as liabilities arising from "Proceedings" involving the transferred businesses "initiated prior to the Closing Date," unless otherwise disclosed in the agreement. *Id.* at 15, 16.

The contractual terms "Taxes" and "Proceeding"—the definitions critical to this appeal—are broadly defined. The agreement defines "Taxes" as follows:

> "Taxes" means all federal, state, local and foreign taxes (including income, profit, franchise, sales, use, real property, personal property, ad valorem, excise, employment, social security and wage withholding taxes) and installments of estimated taxes, assessments, deficiencies, levies, imposts, duties, withholdings, or other similar charges of every kind, character or description imposed by any Governmental Authority, and any interest, penalties or additions to tax imposed thereon or in connection therewith.

D. Ct. Dkt. 61-1, at 86. "Proceeding" is defined in similarly broad terms:

> "Proceeding" shall mean any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation that is or has been commenced, brought, conducted or heard at law or in equity or before any Governmental Authority or any arbitrator or arbitration panel.

*Id.* at 84. The purchase agreement contains a choice-of-law provision stating that the parties' rights and obligations in connection with the transaction "shall be governed by and construed in accordance with the Laws of the State of New York (excluding the choice of law rules thereof, other than Section 5-1401 of the New York General Obligations Law)." *Id.* at 70.

### B. Appellant's Dispute With The India Department of Telecommunications

1. Under the Telegraph Act of 1885, the Indian government has the exclusive authority to own and operate telecommunications facilities in India. D. Ct. Dkt. 75, at 7. The Act authorizes the Indian government to permit a private party to operate a telecommunications business "by granting a license in his favour on such conditions and in consideration of such terms as

8

it thinks fit." D. Ct. Dkt. 63-9, at 22. Since 1994, the Indian government has allowed private entities to provide telecommunications services in India under government licenses. D. Ct. Dkt. 75, at 9. The licenses are mandatory and their terms non-negotiable. *See* D. Ct. Dkt. 64-2, at 1.

From 1994 to 1999, the general practice of the India Department of Telecommunications was to grant licenses in exchange for a fixed fee. D. Ct. Dkt. 75, at 10-11. Beginning in 1999, however, the Department began to transition to a new revenue-sharing regime under which licensees would pay fees based on a percentage of their adjusted gross revenue. *See id*. at 11.

The Department of Telecommunications has established standard procedures for determining the amount of a licensee's adjusted gross revenue. Under a 2002 amended license agreement, appellant is required to self-report its adjusted gross revenue and to pay fees calculated on that basis. *See* D. Ct. Dkt. 75, at 11. Fees are to be paid quarterly and submitted with audited annual assessments certified by the statutory auditor of the licensee, along with a sworn affidavit by a representative of the licensee. *Id*. at 12. The licensee's records are "subject to such scrutiny as may be prescribed by the [Department] so as to facilitate independent verification of the amount due," and the Department has "a right to call for and the Licensee shall be obliged to supply and provide for examination any books of accounts that the Licensee may maintain in respect of the business carried on to provide the service(s) under

this Licence at any time." D. Ct. Dkt. 64-3, at 4. The licensee may challenge any assessment by the Department before an administrative body called the Telecom Disputes Settlement and Appellate Tribunal. *See* D. Ct. Dkt. 75, at 10, 13. The licensee may seek to appeal a decision of the Tribunal to the Supreme Court of India. *Id.* at 12.

In 2003, several licensees in India brought legal challenges to the definition of adjusted gross revenue that the Department of Telecommunications was using to calculate license fees. D. Ct. Dkt. 75, at 14. In particular, the providers challenged the Department's inclusion of revenue accruing from all of the licensees' operations, whether or not those operations related to licensed telecommunications activity. *See* D. Ct. Dkt. 64-3, at 7; D. Ct. Dkt. 64-4, at 3. The service providers contended that only income directly related to licensed operations should be included in the computation. D. Ct. Dkt. 75, at 14. At the time the spin-off transaction involving appellant closed, the providers' challenges were still pending before the Telecom Disputes Settlement and Appellate Tribunal. *See id.*

2. On March 14, 2005—approximately one month before the closing date of the spin-off transaction—the Department of Telecommunications issued a "Provisional License Fee assessment" to appellant, demanding that appellant pay approximately 245 million rupees (approximately $5.6 million at the time) for additional license fees, spectrum-usage charges, penalties, and

interest for a period spanning from 2001 to 2003. D. Ct. Dkt. 64-5, at 1. The notice demanded that appellant pay the assessment within ten days. *Id*. It also stated that appellant "must contact the [Department] within 7 days" of the date of the letter if appellant "require[d] any clarification." *Id*. Consistent with the position the Department took in the pending proceedings before the Tribunal, its demand was based upon all of appellant's revenues, including both activities covered by appellant's 2002 amended license (*e.g.*, the provision of telecommunications service) and activities that were not subject to the license (*e.g.*, the sale or lease of hardware). *See id*. at 2-3.

Appellant did not pay the assessment within the ten-day period. D. Ct. Dkt. 75, at 15. Instead, appellant filed a timely written objection with the Department, arguing that the Department's calculation of adjusted gross revenue must be limited to revenues from activities covered by the 2002 amended license. *See* D. Ct. Dkt. 64-6, at 1-2. Over the weeks that followed and before the closing date, appellant continued to dispute the amount due under the provisional assessment through written submissions and in-person meetings with Department officials. Appellant sent two letters to the Department before the closing date of the purchase agreement, asking the Department to correct its assessment. *See* D. Ct. Dkt. 64-8 & 64-9. Appellant also met twice with Department officials before the closing date to discuss the assessment, present arguments, and submit additional information to the Department. *See* D. Ct.

11

Dkt. 64-8, at 1; D. Ct. Dkt. 64-9, at 1. After those meetings, the Department "advised that [appellant] should submit" certain information "as soon as possible to enable [the Department] to review the computation" of the license fees. *See* D. Ct. Dkt. 64-9, at 2.

In September 2005, the Department sent to appellant an updated assessment, which rejected appellant's objections to its calculation of the amounts owed and actually increased the total amount demanded. D. Ct. Dkt. 75, at 17. The Department updated the assessment again in January 2006, increasing the amount demanded once more. *See id.* at 17-18.

3.   In February 2006, appellant brought an action before the Telecom Disputes Settlement and Appellate Tribunal to challenge the Department's license-fee assessment and, in particular, its definition of adjusted gross revenue. *See* D. Ct. Dkt. 64-12, at 4-23. In 2007, the Tribunal ruled in favor of appellant and the other telecommunications service providers raising similar challenges. D. Ct. Dkt. 75, at 18.

Years of litigation ensued. *See* D. Ct. Dkt. 75, at 18. During that time, the Department continued to impose increased assessments for successive annual periods, as well as additional interest, penalties (assessed at 150% of the principal), and interest on penalties. *See id.* at 15, 18-20.

In 2019, the Supreme Court of India issued a final decision resolving the legal challenges to the Department's method of calculating adjusted gross revenue. *See* D. Ct. Dkt. 75, at 18; *see generally* D. Ct. Dkt. 63-10 (opinion of Indian Supreme Court). The court rejected the earlier decision by the Telecom Disputes Settlement and Appellate Tribunal and upheld the Department's approach. *See* D. Ct. Dkt. 75, at 18. Requests for reconsideration filed by appellant and other telecommunications service providers were denied. *Id.*

## C. Procedural History

1. In November 2005, following the closing of the purchase agreement, appellant notified appellee of the license-fee assessment imposed by the Department of Telecommunications and asked whether appellee wished to participate in or assume control of the dispute with the Department, as appellee was permitted to do under Section 9.7 of the purchase agreement. D. Ct. Dkt. 61-6, at 1; *see* D. Ct. Dkt. 61-1, at 65. The following month, appellee sent a response stating that its "initial assessment" was that any liability associated with the dispute was an "Assumed Liability"—that is, was not subject to indemnification—under the terms of the purchase agreement. D. Ct. Dkt. 61-7, at 1. Appellee also stated, "we will complete our assessment and let you know our final position." *Id.* Appellant provided periodic updates and engaged in further correspondence with appellee about the license-fee assessment over

approximately 14 years until the Supreme Court of India issued its decision in 2019. *See* D. Ct. Dkt. 61-8 & 61-9.

The day after the Supreme Court issued its decision, appellant e-mailed appellee to seek indemnification for the judgment. D. Ct. Dkt. 61-10, at 1. In appellant's view, the license fees were indemnifiable for two independent reasons: they constituted "Taxes" under the agreement, and appellant's pre-closing efforts to dispute the fees constituted "Proceedings." *See* D. Ct. Dkt. 61-11, at 1. Appellee disagreed and, for the first time, formally declined to provide indemnification. *See id.*

2.     On March 27, 2020, appellant filed suit against appellee in the United States District Court for the Southern District of New York, alleging that appellee had wrongfully denied appellant's request for indemnification of the license fees, interest, and penalties. D. Ct. Dkt. 1, at 1-14. As before, appellant contended that the license fees constituted "Taxes" and liabilities arising out of pre-closing "Proceedings." *Id.* at 7-8. Appellant sought damages and injunctive and declaratory relief. *Id.* at 9-13.

Appellee moved to dismiss the complaint, arguing that the plain language of the definitions of "Taxes" and "Proceeding" in the purchase agreement did not cover appellant's demand for indemnification. *See* D. Ct. Dkt. 18, at 8-30. Appellee contended, among other things, that the fees were not "Taxes" as defined in the agreement because they would not be considered

14

taxes under the law of India. *See id.* at 26-30; D. Ct. Dkt. 19, at 1. In its opposition to the motion to dismiss, appellant argued, in reliance on the agreement's New York choice-of-law provision, that Indian law was irrelevant. *See, e.g.*, D. Ct. Dkt. 30, at 21-22. The district court denied the motion to dismiss in a summary order. It concluded that "there are important disputes about the meaning of key terms" and that the "law and practices regarding taxes and assessments in India are disputed." D. Ct. Dkt. 35.

2.     After conducting limited discovery, an exchange of expert reports on Indian law, and depositions of the experts, the parties filed cross-motions for summary judgment on the question of liability. *See* D. Ct. Dkt. 60, 67.

Appellant argued that the license fees constituted indemnifiable "Taxes" under the terms of the purchase agreement and *Innophos, Inc.* v. *Rhodia, S.A.*, 882 N.E.2d 389 (N.Y. 2008), which held that a water-extraction fee imposed by the Mexican government constituted indemnifiable "Taxes" under an agreement that defined that term in a manner substantially similar to the agreement here. D. Ct. Dkt. 60, at 22-25. Appellant also contended that the license fees constituted "assessments," "deficiencies," or "levies," or were at least "similar" to those items. *Id.* at 25-31. Appellant disagreed with appellee that the law of India was relevant to determining whether the license fees constituted "Taxes," noting that the parties had selected the law of New York to govern the purchase agreement and that the fees in any event did constitute

taxes under Indian law. *Id.* at 20-22, 31-43. Finally, appellant argued that the fees constituted liabilities arising from indemnifiable "Proceedings" before the Department of Telecommunications prior to closing. *Id.* at 43-48.

3. In a brief opinion, the district court granted appellee's motion for summary judgment and denied appellant's cross-motion for partial summary judgment. S.A. 1-8. The court first addressed the question whether the license fees constituted indemnifiable "Taxes" under the purchase agreement. The court reasoned that *Innophos* was distinguishable, principally on the ground that the definition of "Taxes" in that case "enumerated a much longer and more extensive list of exemplary taxes or governmentally-imposed charges." *See* S.A. 6. The court further stated, without citation to anything in the record or any legal authority, that "license fees permitting businesses to operate generally are not considered 'United States federal, state or local or non-United States taxes, assessments, charges, duties, levies, or other similar governmental charges of any nature,'" or "assessments, deficiencies, levies, imposts, duties, withholdings, or other similar charges." *Id.*

The district court recognized that there were "substantial likenesses" between the fees at issue and franchise and excise taxes. S.A. 7. But the district court nevertheless rejected appellant's argument that the license fees fell within the contractual definition of "Taxes" because they were similar to those

taxes. *See* S.A. 6-7. The court stated, again without elaboration, that "[a] franchise tax typically is applied to a general classification of companies," whereas a "license fee typically is applied to a specific activity." S.A. 6. With respect to excise taxes, the court reasoned that the Indian government had charged a fee "not because [appellant] operated a business, but because India, as a sovereign, owned the air above its territory, and charged for the privilege of 'moving' communications through the airways." S.A. 7. In reaching those conclusions, the court emphasized that "the license fee charged by the Agreement" was not expressly included in the contractual definition of "Taxes" and the term "license" is not "one of the enumerated types of 'Taxes.'" *Id*. The court did not address whether the fees constituted taxes under the law of India. Its only mention of Indian law was a statement that "[t]he parties point to nothing in the law of India that changes the plain meaning of the contract." S.A. 6.

With respect to appellant's argument that the license fees constituted liabilities arising out of pre-closing "Proceedings," the district court stated that "the indemnification provision only covers Proceedings 'against [Hughes Network Systems Inc.] and its Affiliates.'" S.A. 7. The court further concluded, with scant explanation, that appellant's efforts to contest the Department's assessment of additional license fees and penalties before the Department did not constitute "Proceedings." S.A. 7-8.

17

## SUMMARY OF ARGUMENT

I.     The license fees imposed on appellant by the Department of Tele-communications of India constitute indemnifiable "Taxes" under the purchase agreement.

A.     The plain language of the agreement's definition of "Taxes" encompasses the license fees, and the decision in *Innophos, Inc.* v. *Rhodia, S.A.*, 882 N.E.2d 389 (N.Y. 2008), shows why. The definition of "Taxes" in the agreement there included a list of enumerated taxes and also covered all "other similar governmental charges of any kind whatsoever." Both the New York Appellate Division and the New York Court of Appeals concluded that the broad definition of "Taxes" encompassed a water-extraction fee imposed by the Mexican government—in particular, because the fee was sufficiently "similar" to one of the particular types of taxes listed. In reaching that conclusion, neither the Appellate Division nor the Court of Appeals addressed or relied on Mexican law, even though the defendant had submitted expert testimony that the charges at issue were not considered taxes in Mexico.

*Innophos* guides the correct resolution of this case. As was the case in *Innophos*, the definition of 'Taxes' here includes a list of enumerated items followed by a broad general category: namely, "other similar charges of every kind, character or description imposed by any Governmental Authority."

18

Other aspects of the contract underscore the breadth of the definition, including the agreement's rules of construction requiring specific examples not to be read to limit more general language.

The license fees imposed by the Department of Telecommunications either qualify as several of the enumerated items in the definition of "Taxes" or are at least sufficiently "similar" to those items to require indemnification. The license fees qualify as (or are similar to) mandatory franchise taxes and excise taxes in their purpose and operation. Indeed, they are substantively equivalent to franchise and excise taxes that New York imposes on telecommunications service providers operating in New York. The fees also are (or are similar to) "assessments," "deficiencies," or "levies" under the plain meaning of those terms, which are not limited to the tax context and are used generally to refer to the imposition and collection of charges due. Indeed, as noted, the payment demand from the Department of Telecommunications stated on its face that it was an "assessment."

B. The district court erred by concluding that the license fees did not constitute "Taxes" under the purchase agreement. The court discounted *Innophos* because the list of enumerated items in the definition of "Taxes" in that case was longer than the list of enumerated items in the definition here. But that is of no moment, because the *Innophos* court primarily relied on the

broad general clause in the agreement there, and the general clause in the agreement here is at least as broad.

The district court's cursory rejection of appellant's argument concerning "assessments," "deficiencies," and "levies" is unpersuasive. Regardless of the court's intuition, the plain meaning of those words encompasses the license fees; at a minimum, the license fees are sufficiently similar to fall within the definition's general clause. The court's analysis of franchise and excise taxes is similarly unpersuasive.

II.     The license fees are also indemnifiable for the independent reason that they constitute liabilities arising out of pre-closing "Proceedings" under the purchase agreement. Because the amount of damages owed to appellant may be different under the "Proceedings" provision than under the "Taxes" provision, appellant respectfully requests that the Court address both issues.

A.     The plain language of the agreement's definition of "Proceeding" extends to appellant's pre-closing efforts to challenge the license fees. Under the definition, appellant's interactions with the Department of Telecommunications amounted to "inquir[ies]," "audit[s]," and "examination[s]," as well as "proceeding[s]" and "hearing[s]." Before the closing date, appellant prepared and submitted to the Department a self-assessment, audited by a third-party auditor; the Department examined the self-assessment and demanded addi-

20

tional payment; and appellant objected in writing, submitted additional materials, met twice with Department officials to present arguments, and provided further materials at the Department's request. Those interactions easily rise to the level of "Proceedings" for purposes of the purchase agreement.

B. The district court erred by concluding that appellant's pre-closing actions did not constitute "Proceedings." The court's statement that the indemnification provision covers only "Proceedings 'against [Hughes Network Systems Inc.] and its Affiliates'" seemingly referred to the fact that *appellant* filed the formal action in the Telecom Disputes Settlement and Appellate Tribunal against the Department of Telecommunications (and not the other way around). But that disregards the pre-closing interactions between appellant and the Department. The court provided no explanation for its conclusion that those interactions do not constitute "Proceedings" under the agreement, and the cases it cited for that conclusion do not support it.

Appellee offered additional arguments below that the district court did not address. Those arguments similarly lack merit.

## STANDARD OF REVIEW

This Court applies de novo review to a district court's order granting summary judgment on a question of contract interpretation. *See*, *e.g.*, *Colon de Mejias* v. *Lamont*, 963 F.3d 196, 202 (2020).

## ARGUMENT

The purchase agreement provides that the parties' rights and obligations under the agreement "shall be governed by and construed in accordance with the Laws of the State of New York (excluding the choice of law rules thereof, other than Section 5-1401 of the New York General Obligations Law)." D. Ct. Dkt. 61-1, at 70. Section 5-1401 of the New York General Obligations Laws provides that, where (as here) the value of a contract exceeds $250,000, the contracting parties may select New York law to govern their respective rights and obligations "whether or not [their] contract, agreement or undertaking bears a reasonable relation" to New York. General Obligation Law § 5-1401(1). Accordingly, New York substantive law—but not its "common-law conflict-of-laws principles or statutory choice-of-law directives"—governs the questions of contract interpretation before this Court. *Ministers & Missionaries Benefit Board* v. *Snow*, 45 N.E.3d 917, 924 (N.Y. 2015); *accord* D. Ct. Dkt. 77, at 5 (appellee's memorandum in opposition to appellant's motion for partial summary judgment; "[t]here is no dispute that New York law governs the Purchase Agreement").

Under New York law, "[t]he fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." *Global Reinsurance Corp. of America* v. *Century Indemnity Co.*, 22 F.4th 83, 94 (2d Cir.

2021). "The terms of an agreement provide the best evidence of what the parties intend." *Abdullayeva* v. *Attending Homecare Services LLC*, 928 F.3d 218, 222 (2d Cir. 2019). "[A] written agreement that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms." *Id.*

The parties agree that the language of the purchase agreement is clear and unambiguous, *see* D. Ct. Dkt. 67, at 14, and appellee did not dispute on summary judgment that appellant qualifies as a "Newco Indemnified Person." *See* D. Ct. Dkt. 67, 77. Under the plain language of the agreement and New York law, the charges at issue both qualify as "Taxes" and arose from pre-closing "Proceedings" subject to indemnification by appellee. The district court's contrary conclusions were erroneous, and its judgment should thus be vacated and the case remanded with instructions to enter partial summary judgment for appellant on the question of liability.

## I. THE LICENSE FEES CONSTITUTE 'TAXES' UNDER THE PURCHASE AGREEMENT

The purchase agreement requires appellee to indemnify appellant for "Taxes" for "any Tax Period that ends on or prior to the Closing Date." D. Ct. Dkt. 61-1, at 15, 64. Again, the agreement defines "Taxes" as follows:

> "Taxes" means all federal, state, local and foreign taxes (including income, profit, franchise, sales, use, real property, personal property, ad valorem, excise, employment, social security and wage

23

withholding taxes) and installments of estimated taxes, assessments, deficiencies, levies, imposts, duties, withholdings, or other similar charges of every kind, character or description imposed by any Governmental Authority, and any interest, penalties or additions to tax imposed thereon or in connection therewith.

*Id.* at 86. The license fees imposed by the India Department of Telecommunications satisfy that definition in multiple ways, and the district court erred by concluding otherwise.

### A.   The Plain Language Of The Agreement's Definition Of 'Taxes' Encompasses The License Fees

As *Innophos, Inc.* v. *Rhodia, S.A.*, 882 N.E.2d 389 (N.Y. 2008), makes clear, the plain language of the purchase agreement's definition of "Taxes" encompasses the license fees at issue here.

1.   In *Innophos*, the parties had entered into a purchase agreement that required the defendants to indemnify the plaintiff for all pre-closing "Taxes." 882 N.E.2d at 390. The agreement defined "Taxes" as follows:

> [A]ll . . . United States federal, state or local or non-United States taxes, assessments, charges, duties, levies or other similar governmental charges of any nature, including all income, gross receipts, employment, franchise, profits, capital gains, capital stock, transfer, sales, use, occupation, property, excise, severance, windfall profits, stamp, stamp duty reserve, license, payroll, withholding, ad valorem, value added, alternative minimum, environmental, customs, social security (or similar), unemployment, sick pay, disability, registration and other taxes, assessments, charges, duties, fees, levies or other similar governmental charges of any kind whatsoever, whether disputed or not, together with all estimated taxes, deficiency assessments, additions to tax, penalties and interest.

24

*Id.* at 390-391. The plaintiff, which had operations in Mexico, sought indemnification from the defendant for certain pre-closing water-extraction fees assessed by the Mexican government. *See id.*

The New York Appellate Division rejected the defendant's argument that the charges were not subject to indemnification because they were not "taxes" under Mexican law. 832 N.Y.S.2d 197, 198-200 (2007). "The relevant issue here," the Appellate Division explained, "is not whether the [] assessment is a tax under New York or Mexican law, but rather whether the [] assessment is considered a tax as that term is defined in the parties' agreement." *Id.* at 199. The court concluded that the charges readily fell within the contractual definition of "Taxes." *Id.*

The Court of Appeals affirmed. *See Innophos*, 882 N.E.2d at 390-393. Without addressing whether the charges qualified as "taxes" under Mexican law, the court concluded that, "applying settled principles of contract interpretation," the definition of "Taxes" in the agreement was "sufficiently broad" to encompass the Mexican government's water-extraction fees. *Id.* at 393. In particular, the court reasoned that the fees fell within the general phrase "other similar governmental charges of any kind whatsoever," because they were "'similar,' though not identical, to a severance tax." *Id.* at 391-392 (citation omitted).

2.      The reasoning of *Innophos* applies directly here and demonstrates that the license fees from the India Department of Telecommunications qualify as indemnifiable "Taxes" under the purchase agreement.

a.      The agreement here defines "Taxes" to include "all federal, state, local and foreign taxes," including "franchise" and "excise" taxes. D. Ct. Dkt. 61-1, at 86.  It also includes "assessments," "deficiencies," and "levies." *Id.* And like the definition in *Innophos*, the list of examples in the agreement's definition of taxes ends with a broad, general phrase:  "other similar charges of every kind, character or description imposed by any Governmental Authority." *Id.*; *cf. Innophos*, 882 N.E.2d at 390-391 ("other similar governmental charges of any kind whatsoever").  The word "similar" means "[n]early corresponding; resembling in many respects; somewhat alike; having a general likeness." *United States* v. *Werner*, 620 F.2d 922, 926 (2d Cir. 1980) (citation omitted); *see also*, *e.g.*, *Rousey* v. *Jacoway*, 544 U.S. 320, 329 (2005); *United States* v. *Boulanger*, 444 F.3d 76, 87 (1st Cir. 2006); *Barker* v. *Deere & Co.*, 60 F.3d 158, 162 (3d Cir. 1995).  The phrase "other similar charges of every kind, character or description" is thus "all-encompassing." *Innophos*, 832 N.Y.S.2d at 199.

Other provisions in the agreement underscore the breadth of the definition of "Taxes."  The agreement provides that the word "including" means "in-

cluding, without limitation" (unless a contrary meaning is specified or otherwise required by context). D. Ct. Dkt. 61-1, at 72. And it instructs that, "where specific language is used to clarify or illustrate by example a general statement contained [in the agreement], such specific language shall not be deemed to modify, limit or restrict the construction of the general statement which is being clarified or illustrated." *Id.*

     b.    In multiple respects, the broad definition of "Taxes" encompasses the license fees imposed by the Department of Telecommunications, just as the definition of "Taxes" in *Innophos* encompassed the Mexican government's water-extraction fee. Given the multinational nature of the transaction here and the parties' express agreement to apply New York law, the determination whether a particular government charge constitutes "Taxes" should be based upon its economic substance, not the form in which the government may choose to impose it or the government's characterization of the charge under its own law.

     i.    To begin with, the license fees are "similar" to "franchise taxes" and "excise taxes"—each a type of tax specifically identified in the agreement's definition of "Taxes." D. Ct. Dkt. 61-1, at 86. The district court itself stated that "there are substantial likenesses between government-issued licenses and franchise and excise taxes." S.A. 7.

A franchise tax is a "tax imposed on the privilege of carrying on a business," "usu[ally] measured by the business's income." *Black's Law Dictionary* 1759 (11th ed. 2019) (*Black's*). To take an example that is directly analogous to the charges at issue here, Section 184 of the New York Tax Law imposes a "franchise tax" on corporations that provide specified services within New York State, including "telecommunications services." That franchise tax is measured based on the company's "gross revenues derived from in-state services and the portion of its revenue derived from interstate or international service attributable to New York." *Lawlor* v. *Cablevision Systems Corp.*, 839 N.Y.S.2d 433 (Sup. Ct. 2007).

The assessment by the India Department of Telecommunications is substantively identical. Indian law, like New York law, imposes a non-negotiable assessment on businesses providing telecommunications services within its jurisdiction, with the amount of the assessment being measured based on the business's gross revenues. *See* p. 9, *supra*. Both the state of New York and the Indian government prohibit anyone from providing those services without paying the required charges. That New York labels the charge a franchise tax and India labels it a license fee does not alter their substantive equivalence. Certainly, the charges are "similar" (or, as the district court acknowledged, bear "substantial likenesses"). S.A. 7. The Indian assessments thus fall squarely within the contractual definition of "Taxes."

28

The license-fee assessment is also "similar" to an excise tax, such as the "[e]xcise tax" on telecommunications services imposed under Section 186-e of the New York Tax Law. Like the license-fee assessment, the New York excise tax is a mandatory charge imposed on "gross receipt[s]" of "provider[s] of telecommunication services." N.Y. Tax Law § 186-e(1)(e), (2). And like the India Department of Telecommunications, New York considers "[t]elecommunication services" to include not only the service itself but also "any equipment and services provided therewith." *Compare* N.Y. Tax Law § 186-e(1)(g) *with* D. Ct. Dkt. 64-3, at 7 (defining "adjusted gross revenue" to include "all revenues accruing to the [appellant] on account of goods supplied, services provided, leasing/hiring of infrastructure, . . . sale proceeds of instruments (or any terminal equipment including accessories), [and] VSAT hardware/software"). Accordingly, as was the case in *Innophos*, the definition of "Taxes" in the purchase agreement here is "sufficiently broad to encompass" the governmental charge assessed. *Innophos*, 882 N.E.2d at 393.

ii. The Department of Telecommunications charges are also indemnifiable "assessments"—as the Department itself described them—or are "similar" to "assessments." An "assessment" is a "[d]etermination of the rate or amount of something, such as a tax or damages," or the "[i]mposition of something, such as a tax or fine, according to an established rate." *Black's* 144; *see also*, *e.g.*, 1 *Oxford English Dictionary* 710 (2d ed. 1991) (*Oxford*)

("[t]he determination or adjustment of the amount of taxation, charge, fine, etc., to be paid"; "[t]he scheme of charge or taxation so adjusted"); *Webster's Third New International Dictionary* 131 (2002) (*Webster's*) ("the act of apportioning or determining an amount to be paid").

The license fees satisfy that definition. They constitute a determination of the amount that appellant is required to pay to the Indian government for its previous use of the nation's telecommunications spectrum. The fees are primarily measured "according to an established rate," *Black's* 144: namely, appellant's "adjusted gross revenue." D. Ct. Dkt. 75, at 10-11. And as was the case in *Innophos*, the notice from the Indian government characterized the demand for payment as a "Provisional License Fee assessment." D. Ct. Dkt. 64-5, at 2; *cf. Innophos*, 832 N.Y.S.2d at 199 (noting that the water-extraction fees were "denominated as [assessments] in the official notification sent pre-closing to defendants").

Even in the specific context of taxation, an "[a]ssessment" is an "official recording of a taxpayer's liability, which occurs after information relevant to the calculation of that liability is reported to the taxing authority." *Direct Marketing Association* v. *Brohl*, 575 U.S. 1, 9 (2015); *see* 26 U.S.C. § 6203. At a minimum, the license fees here are "similar charges" to tax assessments: the

Indian government officially recorded appellant's liability for using the tele-communications spectrum based on appellant's periodic reports of its adjusted gross income. *See* D. Ct. Dkt. 75, at 11-12.

iii.    The license fees are also "deficiencies" or "similar charges."  The ordinary meaning of "deficiency" is a "lack, shortage, or insufficiency of some-thing that is necessary." *Black's* 534; *accord* 2 *Oxford* 381 ("[t]he quality or state of being deficient or wanting"); *Webster's* 592 ("the quality or state of being deficient").  As New York law makes clear, the use of that term is not confined to the tax context.  For example, the New York Banking Law allows the Superintendent of Financial Services to "levy an assessment" upon a bank for a "deficiency" in reserves.  N.Y. Banking Law § 19.  Elsewhere, the Bank-ing Law refers specifically to a "tax deficiency," showing that the word "defi-ciency" alone is not inherently connected to taxation.  *See* N.Y. Banking Law § 619(2)(v).

Laws from other jurisdictions similarly use the word "deficiency" out-side the tax context to refer to an insufficiency.  *See, e.g., Camden County Council on Economic Opportunity* v. *Department of Health & Human Ser-vices*, 586 F.3d 992, 994 (D.C. Cir. 2009) (noting that, in the context of Head Start, a "deficiency" is defined as "not in compliance with State or Federal requirements" (citation omitted)); *Quinn Construction, Inc.* v. *RC Dolner*

*LLC*, 187 Fed. Appx. 129, 130 (3d Cir. 2006) (explaining that a state construction statute defined the phrase "deficiency item" as "[w]ork performed but which the owner, the contractor or the inspector will not certify as being completed according to the specifications of a construction contract" (citation omitted)); *In re Prestige Limited Partnership-Concord*, 234 F.3d 1108, 1116 (9th Cir. 2000) (noting that a state statute defined "deficiency" as "that part of a debt secured by mortgage not realized from sale of mortgaged property" (citation omitted)).

Even in the tax context, the word "deficiency" means only "the amount of tax imposed less any amount that may have been reported by the taxpayer on his return." *Laing* v. *United States*, 423 U.S. 161, 173 (1976); *see* 26 U.S.C. § 6211. Tax law thus does not employ the word "deficiency" in some specialized way; it simply takes the ordinary meaning of the word and applies it in the tax context.

The license-fee assessment here constitutes an insufficiency, and thus a "deficiency," in appellant's payments for its use of India's telecommunications spectrum. For example, the assessment notice calculates the outstanding balance based upon the difference between the "LF due" ("LF" meaning "license fee") and the "LF paid." D. Ct. Dkt. 64-5, at 2. And the judgment from the Supreme Court of India requires appellant to pay outstanding fees, penalties, and interest that appellant had not paid. Because appellant owed more than

32

it had paid, its payments were insufficient, giving rise to a "deficiency" or a "similar charge."

iv.     The license fees qualify as "levies" as well.  A levy is "[t]he imposition of a fine or a tax," *Black's* 1091, or "[t]he action of collecting an assessment, duty, tax, etc.," 8 *Oxford* 871; *see also Webster's* 1301 ("the imposition or collection of an assessment, tax, tribute, or fine").  As at least one other court of appeals has noted, the word "levied" is a synonym of "imposed."  *See Dear* v. *Q Club Hotel, LLC*, 933 F.3d 1286, 1294 n.3 (11th Cir. 2019); *accord Rincon Band of Luiseno Mission Indians* v. *Schwarzenegger*, 602 F.3d 1019, 1053 n.4 (9th Cir. 2010) (Bybee, J., dissenting).  A "levy" is thus not limited to the context of taxation.  *See also* N.Y. Insurance Law § 7430 (providing for a judicial "[l]evy of assessments" on insurers); N.Y. Banking Law § 19 (providing for a "levy" of an assessment on banks).  Indeed, the word "levy" is frequently used to mean "take or seize property in execution of a judgment."  *United States* v. *Parker*, 927 F.3d 374, 380 n.7 (5th Cir. 2019) (citation omitted); *see* 28 U.S.C. § 3203(d)(1); *Foley* v. *West-Herr Ford, Inc.*, 974 N.Y.S.2d 697, 700 (App. Div. 2013).

The record confirms that the license-fee assessment constituted a "levy" or a "similar charge."  The Department of Telecommunications imposed the fees, in addition to penalties and interest, on appellant.  *See* D. Ct. Dkt. 64-5, at 2.  The license agreement between appellant and the Indian government

refers to the "levy" of license fees. D. Ct. Dkt. 64-1, at 7, 49; D. Ct. Dkt. 64-3, at 7. And the Supreme Court of India's 2019 decision likewise refers to the "[l]evy of interest, penalty[,] and interest on penalty" on the license fees. D. Ct. Dkt. 63-10, at 133.

### B. The District Court Erred By Concluding That The License Fees Did Not Constitute 'Taxes' Under The Agreement

The district court concluded that *Innophos* was distinguishable and, on that basis, held that the license fees did not fall within the agreement's broad definition of "Taxes." S.A. 5-7. The district court's reasoning was incorrect.

1. The district court concluded that *Innophos* was not controlling because, in its view, the definition of "Taxes" in the agreement in *Innophos* was "far broader" than the definition of "Taxes" in the agreement here. *See* S.A. 6. But the only basis the district court offered for that conclusion was that the agreement in *Innophos* included a "longer and more extensive list" of enumerated taxes. *Id*.

The district court's conclusion does not follow from its premise. Both definitions include a significant number of examples, even if the definition in *Innophos* included more. And more to the point, both agreements included a sweeping general clause that revealed an intent to include not only the numerous enumerated charges, but any conceivable type of charge that could be called "similar." The district court's reasoning that the scope of the contractual definition of "Taxes" should depend on the number of specific examples it

34

provides is also at odds with the express definition of "including" in the purchase agreement here to mean "including, without limitation," and the instruction that, "where specific language is used to clarify or illustrate by example a general statement contained [in the agreement], such specific language shall not be deemed to modify, limit or restrict the construction of the general statement which is being clarified or illustrated." D. Ct. Dkt. 61-1, at 72. Given that the breadth of the general clause formed the basis for the decision in *Innophos*, the district court erred by focusing on the number of particular examples in the list here. *See* S.A. 6.

For related reasons, the district court erred by characterizing the decision of the parties "not to include 'license' as one of the enumerated types of 'Taxes'" as a "strong indication" that the parties intended to exclude the license fees from the scope of appellee's indemnity obligation. *See* S.A. 7. That interpretation would render the more general clause superfluous—a disfavored result in contract interpretation, *see Ajdler* v. *Province of Mendoza*, 890 F.3d 95, 100 (2d Cir. 2018)—and would conflict with the agreement's rule of construction that specific examples are not to be construed to limit more general phrases. It would also contravene *Innophos*: the definition of "Taxes" in the agreement there did not include "usage" or "extraction" fees, yet the Court of Appeals held that the definition's general clause encompassed the water-extraction fees at issue. *See* pp. 24-25, *supra*. To be sure, the agreement here

35

does use the word "license" elsewhere. *See* S.A. 7. But it does so in contexts wholly unrelated to the payment of license fees, and nowhere even refers to "license fees." *See* D. Ct. Dkt. 61-1, at 77.

2. The district court acknowledged that there are "substantial likenesses between government-issued licenses and franchise and excise taxes." S.A. 7. In light of the definition's inclusion of governmental charges that are "similar" to the listed taxes (which include both franchise and excise taxes), that acknowledged "likeness[]" should be dispositive.

The district court nevertheless proceeded to hold that the license-fee assessments did not constitute a "franchise" tax or "similar charge," reasoning that a franchise tax "is applied to a general classification of companies," whereas a license fee "typically is applied to a specific activity, here, satellite services." S.A. 6. The license-fee assessments, however, are functionally equivalent—and certainly are "similar"—to a "general" tax on telecommunications providers within the jurisdiction. In both India and New York, businesses providing telecommunications service must pay "for the privilege" of engaging in that line of business "within the boundaries of the taxing authority." *See id.* (quoting *Black's*, *supra*); *see also* p. 28, *supra*. Regardless of whether the license-fee assessments qualify as franchise taxes, the "substantial likenesses" between the two are sufficient to bring them within the ambit of the general clause. S.A. 7.

3.   The district court agreed with appellant that an "excise tax" is a "tax imposed on the manufacture, sale, or use of goods," or on "an occupation or activity." S.A. 7 (quoting *Black's*). And the court again concluded that there are "substantial likenesses between government-issued licenses and . . . excise taxes." *Id.* But the court again proceeded to hold that such similarity was not sufficient. In the court's view, the license fees were not "excise taxe[s]" because the "government of India charged a license fee, not because plaintiff operated a business, but because India, as a sovereign, owned the air above its territory, and charged for the privilege of 'moving' communications through the airways." *Id.*

The district court's suggestion that the charges imposed by the Indian government are for the privilege of moving communications through the airways is unsupported. Quite to the contrary, the record reflects that those charges are based principally on the gross revenues of appellant's overall business activities. *See* D. Ct. Dkt. 75, at 11. The district court's reasoning is also inconsistent with its own acknowledgment that the license-fee assessments were being imposed for "a specific category of business activity"—namely, "satellite services." S.A. 6. The court's description of the license-fee assessments falls squarely within the definition of an excise tax on a business activity.

37

And once again, the assessments are "similar" to excise taxes, in that the Indian government is mandating that appellant pay a non-negotiable charge for providing a specific service.

4.      The district court also determined that the license fees did not qualify as "assessments," "deficiencies," or "levies." S.A. 6. But the only reasoning the court provided to support that determination was that "[l]icense fees permitting businesses to operate generally are not considered" to be assessments, deficiencies, or levies. *Id.* That is both conclusory and incorrect. For one thing, the license-fee assessments here fit comfortably within the plain meaning of the terms "assessment," "deficiency," and "levy." *See* pp. 29-34, *supra.* For another, the district court ignored the general clause in the definition that covers "similar charges of every kind, character or description." S.A. 3. Even if the district court were correct that the license-fee assessments were not identical to "assessments," "deficiencies," or "levies," those assessments were certainly sufficiently "similar" to come within the scope of the definition. Indeed, the district court itself referred to the fees as an "assessment." *See* S.A. 3-4.

## C.      Indian Law Is Irrelevant To The Determination Of Whether The License Fees Constitute 'Taxes' Under The Purchase Agreement

In the proceedings below, appellee argued that the district court should determine whether the license fees constituted "Taxes" under the purchase

agreement in part by determining whether they constituted taxes under the law of India. *See, e.g.*, D. Ct. Dkt. 67, at 33-45; D. Ct. Dkt. 77, at 5-7. Accordingly, during the limited discovery period, the parties exchanged reports from experts on Indian law and deposed each other's experts. The parties also submitted expert declarations concerning Indian law in connection with their cross motions for summary judgment.

As appellant's expert on Indian tax law explained, under decisions of the Supreme Court of India over many years, Indian law would consider the assessments at issue "taxes." *See* D. Ct. Dkt. 63-1, at 14-24. For example, in the leading case of *Corporation of Calcutta* v. *Liberty Cinema*, (1965) 2 SCR 477, the Supreme Court held that a fee required to operate a movie theater constituted a tax, although the governing statute characterized it as a license fee.

This Court, however, need not address any issues of Indian law for two reasons. First, *Innophos* makes clear that, when New York law governs an indemnification agreement, the question of whether a charge by a foreign government constitutes an indemnifiable "tax" under the contract does not depend on whether the charge qualifies as a tax under foreign law. *See* pp. 24-25, *supra*. Second, the district court made no findings about the substance of Indian law. Its only reference to that law was the passing statement that "the parties point to nothing in the law of India that changes the plain meaning of

39

the contract." S.A. 6. If this Court were to determine that foreign law is relevant, the proper course, consistent with this Court's precedents, would be to remand to the district court to determine the content of Indian law in the first instance. *See* Fed. R. Civ. P. 44.1; *Bugliotti* v. *Republic of Argentina*, 952 F.3d 410, 413 (2d Cir. 2020) (remanding for the district court to make a determination of foreign law where the district court had "not focus[ed] on th[e] question").

## II. APPELLANT IS ALSO ENTITLED TO INDEMNIFICATION BECAUSE ITS PRE-CLOSING ACTIONS CHALLENGING THE LICENSE FEES CONSTITUTED 'PROCEEDINGS' UNDER THE PURCHASE AGREEMENT

The purchase agreement also requires appellee to indemnify appellant for liabilities arising from "Proceedings . . . initiated prior to the Closing Date" and not listed on a disclosure schedule. D. Ct. Dkt. 61-1, at 16, 64. As noted above, the purchase agreement defines "Proceeding" as follows:

> any action, suit, litigation, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceedings), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation that is or has been commenced, brought, conducted or heard at law or in equity or before any Governmental Authority or any arbitrator or arbitration panel.

*Id*. at 84. The license fees imposed by the Department of Telecommunications are not listed on the purchase agreement's disclosure schedule. *See id*. at 115.

The interactions between appellant and the Department of Telecommunications regarding the assessment before the closing date readily satisfy the

definition of "Proceedings." Before the closing date, appellant prepared and submitted to the Department a self-assessment, audited by a third-party auditor. *See* D. Ct. Dkt. 64-5, at 2; D. Ct. Dkt. 64-3, at 2; D. Ct. Dkt. 75, at 15. The Department, an agency of the Indian government, audited or examined appellant's self-assessment and presented an assessment demanding payment of additional license fees and penalties. *See* D. Ct. Dkt. 64-5, at 2; D. Ct. Dkt. 75, at 15. Appellant then objected to the assessment in writing and pursued an administrative challenge, submitting additional materials in support of its objection. *See* D. Ct. Dkt. 64-8; D. Ct. Dkt. 64-9; D. Ct. Dkt. 64-10; D. Ct. Dkt. 75, at 16-17. Appellant then met twice with the Department to review the assessment, present arguments, and provide further materials supporting its position. *See* D. Ct. Dkt. 64-9. The Department of Telecommunications also requested additional information and made inquiries of appellant, to which appellant responded. *See id.* at 2. Because these interactions between appellant and the Department of Telecommunications fall within the purchase agreement's definition of "Proceeding," the license fees are indemnifiable regardless of whether they also constitute indemnifiable "Taxes."

The district court addressed appellant's arguments on this score in only cursory fashion, and what little reasoning it offered on this point was invalid. The alternative arguments offered by appellee below provide no additional

support for the district court's decision. On this ground, too, the district court's judgment should be vacated.

### A. The Plain Language Of The Agreement's Definition Of 'Proceeding' Extends To Appellant's Pre-Closing Actions Challenging The License Fees

The purchase agreement's definition of "Proceeding" unambiguously encompasses the processes through which the Indian government imposed, and appellant challenged, the license fees. The definition of "Proceeding" is unmistakably broad. It includes both formal and informal actions entertained by any governmental authority, spanning the gamut from "litigation" to an "investigation." D. Ct. Dkt. 61-1, at 84. The use of the word "any" to modify the extensive list of events that constitute "Proceedings" "bespeaks breadth." *Encino Motorcars, LLC* v. *Navarro*, 138 S. Ct. 1134, 1141 (2018). And the sweeping definitions of many of the other "Excluded Liabilities" in the purchase agreement—including the definition of "Taxes"—further reflects the intent of the contracting parties for appellee to provide indemnification in a wide set of circumstances.

Under the agreement's broad definition of the word "Proceeding," appellant's pre-closing efforts to dispute the license-fee assessment constituted "inquir[ies]," "audit[s]," and "examination[s]," as well as "proceeding[s]" and "hearing[s]." *See* D. Ct. Dkt. 61-1, at 84. The license fees are therefore indemnifiable under the purchase agreement.

42

1.     The assessment of the license fees arose from an initial "audit" or "examination" by the Department of Telecommunications of the financial information submitted by appellant, followed by an "inquiry" by the Department.  As appellee acknowledged below, *see* D. Ct. Dkt. 18, at 15, the ordinary meaning of "audit" is a "formal examination of an individual's or organization's accounting records, financial situation, or compliance with some other set of standards." *Black's* 161.  An "examination" is, among other things, "[a] close look at a person or thing to determine its condition." *Id.* at 704.  And, as appellee acknowledges, an "inquiry" is simply "an act of asking for information" that broadly encompasses informal and formal requests.  D. Ct. Dkt. 18, at 21; *see also Black's* 1090 (defining "inquiry" to mean "[t]he act or process of posing questions to elicit information").

Each of those words describes what occurred here.  Under appellant's license agreement, the Department of Telecommunications required appellant to submit accounts audited and certified by an independent auditor, which appellant did.  D. Ct. Dkt. 64-3, at 2.  The Department, in turn, was empowered to examine and audit appellant's self-assessments and payments. *Id.* at 4.

Following appellant's submission of its financial data, but before the closing date, the Department analyzed appellant's accounts and payments to determine whether appellant had correctly calculated and paid the amount of license fees due. *See* D. Ct. Dkt. 64-5, at 2-4.  That examination revealed what

the Department viewed as a deficiency in appellant's payments, leading the Department to impose an assessment and corresponding penalties. *See id.* Appellant then met with Department officials to discuss the assessment, present arguments, and provide additional information; the Department then conducted further review of the calculation of license fees. *See, e.g.*, D. Ct. Dkt. 64-8, at 1; D. Ct. Dkt. 64-9, at 1; D. Ct. Dkt. 64-10, at 1. The Department also "advised that [appellant] should submit" certain information "as soon as possible to enable [the Department] to review the computation" of the license fees. D. Ct. Dkt. 64-9, at 2. After taking that information into account, the Department increased the amount of the assessment it demanded. *See* D. Ct. Dkt. 75, at 17. The Department thus plainly conducted an "audit," "examination," or "inquiry" into the calculations of appellant's license fees.

2.    Appellant's pre-closing efforts to dispute the license fees also constituted "proceedings" under the ordinary meaning of that term. As is relevant here, "proceeding" means "[a]ny procedural means for seeking redress from a tribunal or agency." *Black's* 1457. Other courts of appeals have relied on that definition in various contexts, including disputes concerning the scope of contractual indemnification provisions. *See, e.g., Vazquez* v. *TriAd Media Solutions, Inc.*, 797 Fed. Appx. 723, 726 (3d Cir. 2019) (indemnification agreement); *MusclePharm Corp.* v. *Liberty Insurance Underwriters, Inc.*, 712 Fed. Appx. 745, 755 (10th Cir. 2017) (insurance agreement); *Rumsfeld* v. *General*

*Dynamics Corp.*, 365 F.3d 1380, 1386 (Fed. Cir. 2004) (statute governing allowable costs under a defense contract).

Here, appellant used "procedural means," *Black's* 1457, before closing to seek redress from the Department of Telecommunications. Under the license agreement, the Department prescribed a specific process for the payment of license fees. *See* D. Ct. Dkt. 63-8, at 1-4; D. Ct. Dkt. 64-3, at 3-4. Upon receipt of appellant's self-assessments, the Department initiated a process of reviewing appellant's accounts. *See* D. Ct. Dkt. 64-5, at 1-2. Based on that examination, the Department issued a "Provisional License Fee assessment" requesting payment for unpaid fees, interest, penalties, and interest on penalties. *Id.* Appellant objected in writing and appeared in person with Department officials to challenge the amount of the fees assessed. *See* D. Ct. Dkt. 64-8, at 1; D. Ct. Dkt. 64-9, at 1. The Department thereafter increased the assessment. *See* D. Ct. Dkt. 75, at 17. Each of the steps in that process—from the Department's examination of appellant's self-assessments, to the Department's assessment, to appellant's written response and presentation before the Department—constituted proceedings within the ordinary meaning of that term.

3.     Appellant's interactions with the Department also constituted a "hearing," another term expressly included in the agreement's list of covered "Proceedings." D. Ct. Dkt. 61-1, at 84. In this context, a "hearing" is "[a]ny

setting in which an affected person presents arguments to a decision-maker."
*Black's* 865; *accord Donald B.* v. *Orleans Parish School Board*, 810 F.3d 961, 973 n.42 (5th Cir. 2016).

Appellant's pre-closing communications and meetings with the Department of Telecommunications in an effort to persuade it to correct its assessment carry the indicia of a hearing. Appellant sought and was granted the opportunity to present relevant material and records for the Department's consideration. *See* D. Ct. Dkt. 64-9, at 2; *see also* D. Ct. Dkt. 64-8, at 1, 4 (presenting legal argument). Representatives for appellant appeared in person before the Department to present its arguments and additional materials. *See* D. Ct. Dkt. 64-8, at 1; D. Ct. Dkt. 64-9, at 1. And the Department requested that appellant submit additional information after the in-person meeting. *See* D. Ct. Dkt. 64-9, at 2. The Department thus conducted a pre-closing "hearing" within the meaning of the purchase agreement, in addition to conducting an "audit," an "examination," an "inquiry," and "proceedings."

### B. The District Court Erred By Concluding That Appellant's Pre-Closing Actions Did Not Constitute 'Proceedings'

The district court's unelaborated conclusion that appellant's pre-closing interactions with the Department of Telecommunications did not constitute "Proceedings" was flawed in numerous respects.

1. The district court began by stating that "the indemnification provision only covers to [sic] Proceedings 'against [Hughes Network Systems

Inc.] and its Affiliates.'" S.A. 7. While the court did not provide any further explanation for that statement, the court appears to have been suggesting that the ultimate judgment entered by the Supreme Court of India in 2019 was in a case in which *appellant* had filed suit against the Department. *Cf.* D. Ct. Dkt. 77, at 36 (making this argument). But even taking that as true, it does not alter the conclusion that the pre-closing assessment initiated by the Department of Telecommunications, along with the subsequent pre-closing interactions between the Department and appellant, constituted "Proceedings" within the meaning of the purchase agreement.

In support of its conclusion that appellant's interactions with the Department before the closing did not constitute "Proceedings," the district court cited *Powers* v. *Stanley Black & Decker, Inc.*, 137 F. Supp. 3d 358 (S.D.N.Y. 2015). But that decision supports, not undermines, appellant's position. In *Powers*, the district court determined that an agency order rejecting a party's request for redetermination of certain duty charges fell within a contractual definition of "Legal Proceeding" and was subject to disclosure obligations. *See id.* at 372-373. The court reasoned that the party's request for redetermination and the agency's order denying that request "easily fall[] within the definition of a . . . Proceeding." *Id.* at 373.

Below, appellee argued that *Powers* was distinguishable because the agency order, which followed a legal challenge and formal appeals process,

"squarely ruled . . . on [the] issues in the appeal." *Powers*, 137 F. Supp. 3d at 373. But the court in *Powers* did not conclude that only an "order" that "squarely" resolved the issues presented after a formal appeal could constitute a "proceeding." Instead, the court merely concluded that the administrative order at issue was an "order" as defined in the agreement, which the plaintiff was obligated to disclose. *See id.* Nothing in the opinion supports appellee's suggestion that the term "proceeding" is limited to a "formal appeals process." D. Ct. Dkt. 67, at 25.

In addition, appellee's assertion that the Department of Telecommunications could not "squarely rule" upon its assessment is contrary to the record. The Department did just that when it ordered appellant to pay the assessment with penalties and interest, then increased the amount of the assessment and corresponding penalties and interest after reviewing additional information. *See* p. 44, *supra.* Contrary to appellee's unsupported assertion, appellant did not "ha[ve] to sue [the Department] . . . to obtain resolution of the issue." D. Ct. Dkt. 67, at 25. Instead, it had to sue in order to *contest* the Department's final decision. It does not follow from the fact that the Department's decision was subject to further challenge that it did not "squarely rule" on the dispute presented to it, any more than the district court's ruling here could be deemed not to have squarely ruled on the issues presented merely because it is subject to review by this Court.

2.     Appellee made several additional arguments below that the district court did not address. Those arguments are unpersuasive.

a.     Appellee asserted below that "Proceedings" must be "formal," "adversarial," and "adjudicatory." D. Ct. Dkt. 67, at 16. But not one of those terms is found in the definition of "Proceeding" to which the parties agreed, nor does it comport with the general breadth of the definition.

Here, the parties defined "Proceeding" to encompass informal, non-adversarial, and non-adjudicatory processes such as "inquir[ies]," "audit[s]," and "examination[s]." D. Ct. Dkt. 61-1, at 84. Words like "formal," "adversarial," and "adjudicatory" are "not the sort of term[s] [that] sophisticated, counseled parties would have reasonably left out" of an agreement. *Fundamental Long Term Care Holdings, LLC* v. *Cammeby's Funding LLC*, 985 N.E.2d 893, 897 (N.Y. 2013). If the parties had intended to limit the definition of "Proceeding" to formal, adversarial, and adjudicatory processes involving "evidentiary presentation[s]" before an "adjudicatory body," D. Ct. Dkt. 67, at 21, they could and would have written those words into the agreement's definition. *See, e.g.*, *Capella University* v. *Executive Risk Specialty Insurance Co.*, 617 F.3d 1040, 1043 (8th Cir. 2010) (citing a provision in an insurance contract that distinguished between civil, criminal, and formal administrative or regulatory proceedings); *Medical Mutual Insurance Co.* v. *Indian Harbor Insurance Co.*, 583 F.3d 57, 61 (1st Cir. 2009) (similar).

49

Appellee also contended that "the inclusion of the phrase 'at law or in equity' narrow[s] the contractual definition of 'Proceedings' to only formal, adversarial, and adjudicatory proceedings." D. Ct. Dkt. 67, at 17. But appellee is omitting the words that immediately follow the phrase "at law or in equity"—namely, the phrase "*or* before any Governmental Authority." D. Ct. Dkt. 61-1, at 84 (emphasis added). The phrase "Governmental Authority" is defined even to include quasi-governmental actors and self-regulatory organizations. *See id*. at 80. Nor, contrary to appellee's argument below, does the fact that the Department of Telecommunications' determination was subject to further review render appellant's interactions with the Department something other than a "proceeding." Many proceedings—indeed nearly all federal administrative proceedings, *see* 5 U.S.C. § 706—are subject to review. Yet the possibility of further review does not deprive them of their status as proceedings.

b. Appellee also argued that the pre-closing interactions between appellant and the Department of Telecommunications could not constitute a "hearing" because there was no formal proceeding that resembled a judicial trial. *See* D. Ct. Dkt. 67, at 21-22. That argument lacks merit. As just explained, there is no indication in the language of the purchase agreement that formality is required for an interaction with a governmental body to constitute

a "hearing."  And the ordinary meaning of the word "hearing" does not require as much.  *See* pp. 45-46, *supra*.

What is more, appellee's cramped interpretation runs afoul of the fundamental legal principle that an informal interaction with government officials can constitute a "hearing."  Courts have explained that the opportunity to comment orally and through written submissions usually suffices.  *See*, *e.g.*, *Kaur* v. *New York State Urban Development Corp.*, 933 N.E.2d 721, 735 (N.Y. 2010); *Schiavone Construction Co.* v. *Larocca*, 503 N.Y.S.2d 196, 198 (App. Div. 1986).  For example, as the Supreme Court held in *Goss* v. *Lopez*, 419 U.S. 565 (1975), an "informal[] discuss[ion]" with a decisionmaker to present one's side of the facts constituted a "hearing."  *Id.* at 580-582; *see also Williams* v. *Commissioner*, 718 F.3d 89, 92 (2d Cir. 2013) (noting that a "hearing" before the Internal Revenue Service "may consist of one or more written or oral communications between the Appeals Office and the taxpayer or merely a review of the documents in the case file" without any in-person meeting (citation and internal quotation marks omitted)); *Schmidt* v. *Creedon*, 639 F.3d 587, 596 (3d Cir. 2011) (holding that a "brief and informal" hearing would satisfy due process when terminating or suspending a police officer).

Nor must a hearing provide an opportunity for the cross-examination of witnesses or review of the agency's records.  *See*, *e.g.*, *Goss*, 419 U.S. at 582.  The decisionmaker also need not have formal and final adjudicatory authority

in order to conduct a hearing. *See, e.g.*, *id.*; *Tigrett* v. *Rector & Visitors of University of Virginia*, 290 F.3d 620, 629 (4th Cir. 2002); *see also Goldberg* v. *Kelly*, 397 U.S. 254, 271 (1970) (holding that, when administrative hearings are not final, the decisionmaker need not provide "formal findings of fact and conclusions of law"). In light of that well-established precedent, appellant's meetings with Department of Telecommunications officials constituted "hearings" under the agreement's definition of "Proceeding."

c.     Appellee also asserted below that the breadth of the definition of the term "Proceeding" indicates that it should be construed narrowly to refer only to formal, adversarial adjudication. *See* D. Ct. Dkt. 67, at 16. Otherwise, appellee reasoned, the definition as written defies the reasonable expectations of the parties. *See id.* at 16-17.

That argument fails. As an initial matter, the reasonable-expectations doctrine is applicable only if a contract is ambiguous. *See, e.g.*, *Haber* v. *Saint Paul Guardian Insurance Co.*, 137 F.3d 691, 695 (2d Cir. 1998). Yet appellee has never contended that the agreement here was ambiguous. And even if it were, the mere fact that a party failed to negotiate a satisfactory contract term plainly does not render that term unreasonable, particularly where, as here, the contracting parties are sophisticated actors. *See Grumman Allied Industries, Inc.* v. *Rohr Industries, Inc.*, 748 F.2d 729, 734 (2d Cir. 1984). To the

contrary, to ignore the plain meaning of the agreement's definition of "Proceeding" would violate the parties' reasonable expectations that a broadly written contract definition would be broadly enforced.

*     *     *     *     *

In sum, the district court erred by holding that the license fees imposed on appellant by the India Department of Telecommunications did not constitute "Taxes" or liabilities arising from pre-closing "Proceedings" within the meaning of the parties' agreement. The district court's entry of judgment in favor of appellee was therefore incorrect, and this Court should vacate that judgment and remand with instructions to enter judgment for appellant on the question of liability.

## CONCLUSION

The judgment of the district court should be vacated and the case remanded with instructions to enter partial summary judgment for appellant on the question of liability.

Respectfully submitted,

/s/ Kannon K. Shanmugam

KANNON K. SHANMUGAM
WILLIAM T. MARKS
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300*
  *kshanmugam@paulweiss.com*

H. CHRISTOPHER BOEHNING
JONATHAN HURWITZ
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019*

MARCH 28, 2022

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kannon K. Shanmugam, counsel for appellant Hughes Communications India Private Limited and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(g) and Local Rule 32.1(a)(4), that the foregoing brief is proportionately spaced, has a typeface of 14 points or more, and contains 11,911 words.

MARCH 28, 2022

/s/ Kannon K. Shanmugam
KANNON K. SHANMUGAM

# SPECIAL APPENDIX

**SA-i**

# TABLE OF CONTENTS

Page

District court opinion on summary judgment, Nov. 16, 2021 ...................... SA-1

District court judgment, Nov. 17, 2021 ........................................... SA-9

SA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

\------------------------------------------------------------ x

HUGHES COMMUNICATIONS INDIA :     **OPINION GRANTING**
PRIVATE LIMITED, :     **MOTION FOR SUMMARY**
                 Plaintiff, :     **JUDGMENT AND DENYING**
     -against- :     **MOTION FOR PARTIAL**
:     **SUMMARY JUDGMENT**
:
THE DIRECTV GROUP, INC., :     20 Civ. 2604 (AKH)
:
                 Defendant. :

\------------------------------------------------------------ x

ALVIN K. HELLERSTEIN, U.S.D.J.:

          The instant dispute arises out of an asset purchase agreement in which Defendant

DirecTV Group, Inc. ("Defendant") spun off dozens of its subsidiaries, which included Plaintiff

Hughes Communications India Private Limited ("HCIPL" or "Plaintiff"). Plaintiff brings suit

against Defendant, seeking indemnification for license fees pursuant to the purchase agreement,

which provides indemnification by Defendant "from and against any and all Damages," "arising

out of, relating to, or resulting from . . . [] the Excluded Liabilities." The Excluded Liabilities

include "[a]ll Liabilities for Taxes," as well as "[a]ll Liabilities arising out of Proceedings against

HNS and its Affiliates." I previously denied Defendant's Motion to Dismiss, noting that "there

[were] important disputes about the meaning of key terms" in the Purchase Agreement, and that

"the law and practices regarding taxes and assessments in India [were] disputed." ECF No. 35.

          Having conducted discovery, the Parties now cross-move for summary judgment,

with Plaintiff seeking partial summary judgment on Defendant's liability, and Defendant seeking

summary judgment absolving it of liability. *See* Motion for Partial Summary Judgment ("Pl.

Motion"), ECF No. 59; Motion for Summary Judgment ("Def. Motion"), ECF No. 66. The sole

issues for resolution are whether the licenses fees are a "tax," or Plaintiff's contacts with the

## SA-2

Indian Department of Telecommunications ("DOT") prior to the Closing Date constituted a "proceeding," both as defined by the Purchase Agreement. For the reasons provided below, Defendant's motion for summary judgment is granted, and Plaintiff's motion for partial summary judgment is denied.

## BACKGROUND

The undisputed facts are as follows. Defendant is a satellite service provider, and Plaintiff is an Indian satellite telecommunications company that operates pursuant to a License Fee Agreement with the DOT. *See* Complaint ("Compl."), ECF No. 1; Plaintiff's Undisputed Material Facts Pursuant to Local Rule 56.1 ("Pl. SUF") ¶¶ 31, 34, ECF No. 65.[1] On December 3, 2004, Defendant and its wholly-owned subsidiary, Hughes Network Systems, Inc. ("HNS Inc."), entered into a Contribution and Membership Interest Purchase Agreement (the "Purchase Agreement") to spin off dozens of Defendant's subsidiaries, including Plaintiff. Purchase Agreement ("Purch. Agmt."), ECF No. 61-1. Under the Purchase Agreement, subsidiary HNS Inc. contributed its direct and indirect ownership shares in Plaintiff, to a would-be newly-formed entity, Hughes Network Systems, LLC. *Id.* at 1; Hughes Network System Organizational Chart, Ex. HH, ECF No. 69-34. The transaction closed on April 22, 2005 ("Closing"). Pl. SUF ¶ 10.

As relevant here, the Purchase Agreement contained the following provisions and definitions:

> Indemnification: to "Newco Indemnified Persons" by Defendant "from and against any and all Damages," "arising out of relating to, or resulting from . . . [] the Excluded Liabilities." Purch. Agmt., § 9.5(a) at 54.

> Newco Indemnified Person[]: the Investor, Newco (HNS LLC), and HNS LLC's "Subsidiaries and Representatives from time to time (including persons who were formerly employees, officers and directors of HNS or any of its Affiliates." *Id.*, Ex. A, at A-8.

---

[1] I refer to Plaintiff and Defendant's respective statements of undisputed facts but include only those confirmed as undisputed in the respective counterparty's counter-statements.

2

**SA-3**

<u>Damages</u>: include "assessments, losses, damages, costs, Taxes, expenses, Liabilities, judgments, awards, sanctions, penalties, charges and amounts paid in settlement, including reasonable costs, fees and expenses of attorneys, experts, accountants, . . . consultants, . . . and any other agents or representatives" of the indemnified persons. *Id.* at A-3.

<u>Excluded</u> <u>Liabilities</u>: include "[a]ll Liabilities for Taxes of NHS, HNS Europe, HNS UK or the Transferred Subsidiaries, or relating to the Business or the Contributed Assets, for (A) any Tax period that ends on or prior to the Closing Date[.]" Ex. A, § 2.4(b)(i) at A-14. The Excluded Liabilities also include "[a]ll Liabilities arising out of Proceedings against HNS and its Affiliates involving the Business initiated prior to the Closing Date[.]" *Id.* § 2.4(b)(ix) at 5.

<u>Taxes</u>: "all federal, state, local and foreign taxes (including income, profit, franchise, sales, use, real property, personal property, ad valorem, excise, employment, social security and wage withholding taxes) and installments of estimated taxes, assessments, deficiencies, levies, imposts, duties, withholdings, or other similar charges of every kind, character, or description imposed by any Governmental Authority, and any interest, penalties, or additions to tax imposed thereon or in connection therewith." *Id.*, Ex. A, at A-11.

<u>Governmental Authority</u>: encompasses "any foreign [or] .. . domestic . . . governmental authority, quasi-governmental authority, instrumentality, . . . government or self-regulatory organization, commission, tribunal or organization, or any regulatory, administrative or other agency, or any political or other subdivision." *Id.* at A-5.

On March 14, 2005, Plaintiff received a Provisional License Fee Assessment ("Provisional Assessment") from the DOT, seeking payment for underpaid license fees of approximately 245 million rupees (or approximately $5.6 million dollars at the then-current exchange rate) for fiscal years 2001 to 2003. Defendant's Undisputed Material Facts Pursuant to Local Rule 56.1 ("Def. SUF") ¶ 55. License fees were calculated based upon Plaintiff's self-reported revenues and, as of 1999, amounted to 10 percent of Adjusted Gross Revenues ("AGRs"). *Id.* ¶ 46.[2] The Provisional Assessment directed Plaintiff to pay approximately $3.3 million dollars within ten days or communicate with the DOT within 7 days. *Id.* ¶¶ 56, 60; Pl. SUF ¶ 57.

---

[2] Prior to 1999 and the introduction of the Telecom Policy of 1999 ("NTS-99"), telecommunications providers, such as Plaintiff, paid a fixed fee for their licenses. Def. SUF ¶ 37.

SA-4

Plaintiff did not remit and questioned the amount of the outstanding fees, orally, in writing and in meetings, before and after the closing of the Purchase Agreement. Def. SUF ¶ 61. Plaintiff submitted additional documentation for the DOT's consideration, and on January 3, 2006, DOT provided an updated and increased assessment of amount due, approximately 26 million rupees. Pl. SUF ¶ 64; *see also* ECF No. 64-10.

On February 15, 2006, Plaintiff sued the DOT before the Telecom Disputes Settlement and Appellate Tribunal ("TDSAT") to challenge the DOT's calculations of Plaintiff's AGRs. ECF Nos. 64-12 (copy of Petition filed before the TDSAT on February 15, 2006), 69-5, 69-27. Despite a favorable ruling from the TDSAT in August 2007, the Supreme Court of India subsequently reversed that ruling and reinstated the license fee assessments, interest, and penalties imposed by DOT for fiscal years 2001 through 2019. Pl. SUF ¶ 67; ECF No. 70-11.

Plaintiff alleges that Defendant is obligated to indemnify it for the outstanding license fees with interest and costs, under two separate definitional provisions of the Purchase Agreement—Taxes and Proceedings. The Parties cross-move for summary judgment on the issue of liability and whether the license fees are a Tax, or Plaintiff's Pre-Closing interactions with the DOT constituted a Proceeding.

**DISCUSSION**

I. Legal Standard

To succeed on a motion for summary judgment, the moving party must show that "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine issue" of "material fact" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the" nonmoving party. *Roe v. City*

*of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (citations omitted). However, "[m]ere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen Associates v. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

II. Analysis

    A. The DOT License Fees Are Not An Indemnifiable Tax

        Plaintiff's license fees are imposed pursuant to its License Agreement with the DOT. The amount of the fees is based upon Plaintiff's AGRs, which are, in turn, based upon Plaintiff's self-reported revenues. The Purchase Agreement does not define Taxes to include "license fees," nor does it use the words "fees" or "licenses."

        Plaintiff relies heavily on the New York Court of Appeals's decision in *Innophos, Inc. v. Rhodia, S.A.* There, the court affirmed that "CNA charges"—charges imposed by the Mexican Comision Nacional de Agua ("CNA") for water usage—constituted a "tax" within the meaning of the parties' purchase agreement's expansive definition of taxes. *See Innophos, Inc. v. Rhodia, S.A.*, 10 N.Y.3d 25, 30 (2008). The *Innophos* purchase agreement defined taxes:

> "all . . . United States federal, state or local or non-United States taxes, assessments, charges, duties, levies or other similar governmental charges of any nature, including all income, gross receipts, employment, franchise, profits, capital gains, capital stock, transfer, sales, use, occupation, property, excise, severance, windfall profits, stamp, stamp duty reserve, license, payroll, withholding, ad valorem, value added, alternative minimum, environmental, customs, social security (or similar), unemployment, sick pay, disability, registration and other taxes, assessments, charges, duties, fees, levies or other similar governmental charges of any kind whatsoever, whether disputed or not, together with all estimated taxes, deficiency assessments, additions to tax, penalties and interest."

*Id.* at 27–28. The parties' experts agreed that the Mexican Constitution vested ownership over natural resources, including the water at issue, in the Mexican State. *Id.* at 30. Water was considered "a state-owned natural resource that is regulated by the government in its capacity as a sovereign, and the exploitation of such is only through the granting of a concession." *Id.* The

court held that the CNA charges fell within the purchase agreements definition because they were "similar, though not identical, to a severance tax." *Id.*

Contrary to Plaintiff's assertions, *Innophos* is not "dispositive." Pl. Motion, at 3. The *Innophos* purchase agreement's definition of Taxes was materially different. First, its scope was far broader. It enumerated a much longer and more extensive list of exemplary taxes or governmentally-imposed charges — "assessments, charges, duties, levies or other similar governmental charges of any nature" —followed by an equally extensive and embracive set of examples. Here, the examples of "Taxes" are narrower — "income, profit, franchise, sales, use, real property, personal property, ad valorem, excise, employment, social security and wage withholding taxes." License fees permitting businesses to operate generally are not considered "United States federal, state or local or non-United States taxes, assessments, charges, duties, levies or other similar governmental charges of any nature." Licenses for a business to operate are not "assessments, deficiencies, levies, imposts, duties, withholdings, or other similar charges." The parties point to nothing in the law of India that changes the plain meaning of the contract.

*Franchise Tax*

Plaintiff argues that the license fee charged by the government of India should be classified as a franchise tax, that is, a tax "for the privilege of existing as a corporation," or for a "corporation's privilege of doing business within the boundaries of the taxing authority," of the measured by the annual income or revenues of the corporation within the State. *Bankers Trust New York Corp. v. Dep't of Finance*, 79 N.Y.2d 457, 460 (1992); FRANCHISE TAX, BLACK'S LAW DICTIONARY (11th ed. 2019). A license fee to provide satellite communications is not a franchise tax. A franchise tax typically is applied to a general classification of companies, not to a specific category of business activity. A license fee typically is applied to a specific activity, here, satellite services.

*Excise Taxes*

An "excise tax" is "[a] tax imposed on the manufacture, sale, or use of goods (such as a cigarette tax), or on an occupation or activity (such as a license tax or an attorney occupation fee)." EXCISE TAX, BLACK'S LAW DICTIONARY (11th ed. 2019). The Dictionary juxtaposes "excise tax" with "income tax" and "property tax." The government of India charged a license fee, not because plaintiff operated a business, but because India, as a sovereign, owned the air above its territory, and charged for the privilege of "moving" communications through the airways.

The term "license" in the parties' agreement appears throughout the Purchase Agreement, but not in the definition of what may constitute a tax. Although there are substantial likenesses between government-issued licenses and franchise and excise taxes, the decision of the parties not to include the license fee charged by the Agreement in the definition of Taxes provided in the agreement speaks volumes. The fact that they did not choose to include "license" as one of the enumerated types of "Taxes" is strong indication that this omission was intentional. Nothing in the extensive discovery of this case shows otherwise.

Accordingly, I find that the DOT license fees are not indemnifiable Taxes within the meaning of the Purchase Agreement.

B. HCIPL's Actions Pre-Closing Are Not An Indemnifiable "Proceeding"

The Purchase Agreement requires Defendant to indemnify Plaintiff for "Liabilities arising out of "Proceedings against HNS and its Affiliates involving the Business initiated prior to the Closing Date[.]" Although the Purchase Agreement broadly defines "Proceeding" to include administrative proceedings, contests, hearings, inquiries, inquests, audits, examinations, or investigations before Governmental Authorities, the indemnification provision only covers to Proceedings "against HNS and its Affiliates." Furthermore, Plaintiff's protestations and discussions concerning the correctness of the license fee, and the extra charges

**SA-8**

imposed for late payment, are not a "proceeding against HNS and its Affiliates," nor did

Plaintiff's efforts to reduce the fee charged initiate or constitute a proceeding. *Cf. Powers v.*

*Stanley Black & Decker, Inc.*, 137 F. Supp. 3d 358, 372 (S.D.N.Y. 2015).

## CONCLUSION

For the reasons discussed in this opinion, I hold that the DOT license fees are

neither an indemnifiable Tax, nor were Plaintiff's Pre-Closing interactions with the DOT an

indemnifiable Proceeding. Defendant's motion for summary judgment is granted, and Plaintiff's

motion for partial summary judgment is denied. The Clerk of the Court shall terminate the

motions (ECF Nos. 59, 66) and grant judgment to the defendant, dismissing the complaint with

costs.

SO ORDERED.

Dated:     November 16, 2021              _____/s/ Alvin K. Hellerstein_____
           New York, New York                    ALVIN K. HELLERSTEIN
                                                  United States District Judge

SA-9

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
HUGHES COMMUNICATIONS INDIA PRIVATE
LIMITED,

|  |  |
|---|---|
| Plaintiff, | 20 **CIVIL** 2604 (AKH) |
| -against- | **JUDGMENT** |
| THE DIRECTV GROUP, INC., |  |
| Defendant. |  |

----------------------------------------------------------X

It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion dated November 16, 2021, the DOT license fees are neither an

indemnifiable Tax, nor were Plaintiff's Pre-Closing interactions with the DOT an indemnifiable

Proceeding. Defendant's motion for summary judgment is granted, and Plaintiff's motion for partial

summary judgment is denied. Judgment is entered to the defendant, and the complaint is dismissed

with cost.

**Dated:** New York, New York
November 17, 2021

**RUBY J. KRAJICK**
_____
**Clerk of Court**

**BY:**
**Deputy Clerk**